**KECO R. & D., INC., Appellant,**

v.

**BAKER HUGHES, INC. and Envirotech Controls, Inc., Appellees.**

No. 01–96–00944–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

March 19, 1998.
Rehearing Overruled May 13, 1998.

D. Arlon Groves, Houston, for Appellant.

Steve Rosenblatt, Jacalyn Ann Hollabaugh, Houston, for Appellees.

Before Justices MIRABAL, O'CONNOR, and NUCHIA.

## OPINION

NUCHIA, Justice.

Appellant, Keco R. & D., Inc., plaintiff in the trial court, appeals from the rendition of summary judgment in favor of appellees, Baker Hughes, Inc. and Envirotech Controls, Inc. Baker Hughes has also filed a motion to dismiss the appeal. We overrule the motion. We reverse.

### Facts

Keco is a research and development company. It manufactures a variety of proprietary devices for use in industrial applications, one of which is used in a larger "analyzer" system. An analyzer system protects expensive industrial equipment from trace pollutants. The system accomplishes this, in part, by measuring the concentration of pollutants contained in a gas stream and comparing it to an exact, known level of the pollutant. Over time, an analyzer can drift in its readings; hence, the system requires ongoing, frequent, and accurate calibration. Keco manufactures a calibration apparatus, of which its most important component is a device known as the "Texas Ranger." Keco contends Baker Hughes wrongfully appropriated confidential and trade secret information pertaining to the Ranger.

Keco began selling the Ranger to Baker Hughes in 1987. In response to an increasing number of questions from Baker Hughes regarding the Ranger's design and performance specifications, Keco sought a confidentiality agreement. In December 1989, Keco and Baker Hughes [1] entered into a confidential disclosure agreement. As a condition of the purchase of Rangers, Baker Hughes agreed not to manufacture components of original Keco design while they had an open purchase agreement and for three years thereafter. Baker Hughes further agreed: (1) to keep secret all confidential information, data, or processes supplied; (2) not to use the confidential information for development of competitive component equipment; and (3)

not to take the confidential information from Keco premises, except as authorized.

In 1990, a Baker Hughes employee conducted a variety of tests on the Ranger. The results were presented in a paper written by another Baker Hughes employee and presented at an October 1990 industry trade show. Keco's CEO, Charles Kimbell, attended this trade show, but the evidence does not show whether he attended the presentation of the paper. In April 1991, Kimbell wrote to Baker Hughes complaining about the presentation and accusing Baker Hughes of wrongfully using Keco trade secrets in breach of their agreement. Thereafter, Keco refused to sell a Ranger to Baker Hughes unless Baker Hughes first verified there was a customer order for the unit.

In April 1991, Baker Hughes sought a new supplier and contacted a rival calibration system maker, Kin–Tek. Baker Hughes asked Kin–Tek to provide a device functionally equivalent to the Ranger. It gave Kin–Tek a disassembled Ranger, results of the testing Baker Hughes had performed, promotional literature, and performance specifications. Kin–Tek delivered its replacement product in May 1991. That month, Baker–Hughes canceled its open orders with Keco and ultimately canceled the contract.

### Procedural History

In October 1993, Keco sued Baker Hughes. In its original petition, it contended Baker Hughes and its subsidiary breached the confidential disclosure agreement. Keco sought damages for the breach and loss of sales. It also sought punitive or exemplary damages, based on defendants' "outrageous conduct." Baker Hughes answered with a general denial.

In May 1994, Baker Hughes moved for partial summary judgment on the cause of action for misappropriation of trade secrets,[2] invoking the two-year statute of limitations for tort claims. Keco responded that the

---

1. The actual parties to the agreement were Keco and Tracor Atlas (now Envirotech, a wholly owned Baker Hughes subsidiary). (Charles Kimbell, Keco's CEO, had founded Tracor Atlas, and his son later became its president.)

2. The parties construed the petition as alleging a cause of action based on the tort of misappropriation of trade secrets.

presentation of the paper was merely "plagiarism," and argued its cause of action for theft of trade secrets related to the unauthorized building of the replicate, not to this plagiarism. It also disputed the applicability of the two-year limitations period. The trial court rendered partial summary judgment in favor of Baker Hughes on the tort claims only.

In June 1994, Baker Hughes moved for summary judgment on the breach of contract claim, asserting four grounds: (1) the agreement only forbade *manufacture* of a competing product; (2) Baker Hughes did not give or sell a Ranger to a third party—the third party acquired the Ranger on the open market; (3) it did not disclose confidential information to Kin–Tek, it only disclosed the results of its own tests on the Ranger, the performance specifications it needed, and the manufacturer's claims in promotional literature; and (4) Keco's anticipatory repudiation of the contract absolved Baker Hughes of any breach. Keco disputed these claims and attached to its response Kimbell's affidavit, in which he stated it was not possible for another company to lawfully replicate the Ranger. Keco also attached a letter from a Baker Hughes representative that terminated the contract. The trial court denied this motion for summary judgment.

In March 1995, Baker Hughes again moved for summary judgment, arguing that 18 enumerated trade secrets were not secret. It attached an affidavit from an expert in the industry. Keco countered with an affidavit from Kimbell. The trial court did not immediately rule on the motion. Two months later, Baker Hughes submitted a motion for reconsideration; the trial court again delayed its ruling until January 1996.

In January 1996, after Baker Hughes filed a motion for summary judgment based on deemed admissions, the trial court announced that it would reconsider the former motion based on the 18 trade secrets and gave Keco an opportunity to file a supplemental response. Five days before the hearing, Keco filed its response and affidavit; it also submitted an amended petition adding two defendants and new causes of action for fraud, fraudulent concealment, unfair competition, breach of contract, declaratory judgment, quantum meruit and unjust enrichment, theft of trade secrets, misappropriation of confidential information, negligence and conspiracy, and disparagement of business. Baker Hughes moved to strike the amended pleadings, based on surprise and prejudice. In March, Keco filed a motion for leave to file the amended petition.

On February 29, 1996, the trial court granted the motion for summary judgment in favor of Baker Hughes on the 18 trade secrets. The following day, it dismissed Baker Hughes' counterclaim upon its motion for nonsuit. On June 5, the trial court struck Keco's amended petition and rendered a "final judgment" disposing of all parties and claims.

### The Summary Judgments

Summary judgment is proper only when a movant establishes there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *Randall's Food Mkts., Inc. v. Johnson,* 891 S.W.2d 640, 644 (Tex.1995); *Bangert v. Baylor College of Med.,* 881 S.W.2d 564, 566 (Tex.App—Houston 1st Dist. 1994, writ denied). In reviewing a summary judgment, we indulge every reasonable inference in favor of the nonmovant and resolve any doubts in its favor. *Johnson,* 891 S.W.2d at 644; *Bangert,* 881 S.W.2d at 565–66. When reviewing the granting of a motion for summary judgment, this Court will take all evidence favorable to the nonmovant as true. *Johnson,* 891 S.W.2d at 644; *Bangert,* 881 S.W.2d at 565. A defendant is entitled to summary judgment if the evidence disproves as a matter of law at least one element of each of the plaintiffs causes of action. *Lear Siegler, Inc. v. Perez,* 819 S.W.2d 470, 471 (Tex.1991); *Marchal v. Webb,* 859 S.W.2d 408, 412 (Tex.App.—Houston 1st Dist. 1993, writ denied).

#### 1. The 1994 partial summary judgment on tort claims

In point of error five, Keco contends the trial court erred in rendering partial summary judgment in favor of Baker Hughes on the claim for misappropriation of trade secrets. Baker Hughes invoked the then-

applicabe two-year statute of limitations for tort clains.[3] It argued Keco knew in October 1990 of the publication of its claimed trade secrets, when a Baker Hughes employee presented a paper at an industry trade show Kimbell attended. It attached a copy of the letter Kimbell sent to Baker Hughes on April 26, 1991, in which he said, "This ... is considered plagiarism and it violates the Confidential Disclosure Agreement...." In response, Kimbell submitted an affidavit in which he swore he could not verify Baker Hughes had appropriated Keco's technology until he was able to procure one of the Kin-Tek devices in January 1993. He disagreed with the conclusion that the trade show paper put him on notice that Baker Hughes would give his proprietary equipment to a competitor to be copied and sold.

By May 1991, Baker Hughes gave Kin-Tek the disassembled Ranger, test results, and performance specifications, to build a replacement product. The specific date of the 1990 trade show is not in the record, nor is there evidence to show if Kimbell attended the presentation of the paper when he attended the trade show. The record shows only that he complained about the paper in April 1991 and filed suit on October 27, 1993.

■ In 1997, the Legislature amended the Civil Practices and Remedies Code to add the following section:

### § 16.010 Misappropriation of Trade Secrets

(a) A person must bring suit for misappropriation of trade secrets not later than three years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered.

TEX.CIV.PRAC. & REM.CODE ANN. § 16.010(a) (Vernon Supp.1998).

The effective date of the amendment was May 1, 1997, and the application portion provides:

SECTION 3. (a) This Act applies to all actions:

(1) commenced on or after the effective date of this Act; or

(2) pending on that effective date and in which the trial, or any new trial or retrial

following motion, appeal, or otherwise, begins on or after that effective date.

Act of Apr. 17, 1997, 75th Leg., R.S., ch. 26, § 3(a), 1997 Tex.Gen. Laws 68, 68.

Keco's suit was pending on May 1, 1997. Accordingly, the three-year statute of limitations applies. The evidence raises a fact issue about when the misappropriation was or should have been discovered and whether the suit was timely filed. We hold the trial court erred in rendering partial summary judgment disposing of the tort claim for misappropriation of trade secrets.

We sustain point of error five.

### 3. The 1995 motion for summary judgment on breach of contract claims

■ In points of error three and four, Keco contends the trial court erred in rendering summary judgment in favor of Baker Hughes on its third motion for summary judgment. In January 1995, in response to a Baker Hughes' interrogatory, Keco provided an itemized list of 18 trade secrets it alleged Baker Hughes had misappropriated in breach of the confidential disclosure agreement. In March 1995, Baker Hughes again moved for summary judgment, arguing that the 18 enumerated trade secrets were not secret. It followed the same approach for each of the 18: identifying the trade secret, including a quotation directly from Keco literature relating to it and noting that the "secret" was well known in the industry. Baker Hughes attached an affidavit from Ramesh Chand, an inventor and expert in the field of calibration instruments, in which he confirmed the information Keco claimed constituted trade secrets was already known in the industry. He also explained how Keco's own literature provided him with sufficient information to replicate the Ranger.

In its response, Keco argued (1) Baker Hughes had applied an incorrect definition of trade secret, (2) it should not be limited to the enumerated 18 secrets, and (3) Keco could not enumerate more trade secrets without examining the replicate device. Keco attached an affidavit from Kimbell in which he disputed Chand's conclusions and swore: (1) he personally reviewed the promotional literature for the Ranger to ensure

3. *See* Act of May 17, 1959, § 16.003(a), 1985, 69th Leg., R.S., ch. 285 Tex.Gen. Laws 3242,

3252 (TEX.CIV.PRAC. & REM.CODE ANN. § 16.003(a), since amended).

it divulged no trade secrets; (2) Keco's proprietary devices had never been available on the open market; and (3) Kin–Tek could not have so rapidly developed a replicate unless Baker Hughes divulged confidential information in addition to providing Kin–Tek with the prototype. The trial court granted the motion for summary judgment.

The motions and affidavit are replete with complicated concepts not generally known to persons unfamiliar with this field and these types of devices. Kimbell and Chand examined the same materials and directly contradicted one another in the conclusions they reached. We take Kimbell's assertions as true. We hold there is a genuine issue of material fact regarding whether the trade secrets were disclosed by Keco's own literature or were generally known to the industry. Therefore, there remains an issue of fact concerning whether Baker Hughes breached the contract.

We sustain points of error three and four.

**3. The second motion for summary judgment**

In a cross-point, Baker Hughes contends the trial court erred in denying its June 1994 motion for summary judgment. The general rule is that denial of a motion for summary judgment is not reviewable on appeal, because it is interlocutory. *Cincinnati Life Ins. Co. v. Cates*, 927 S.W.2d 623, 625 (Tex.1996). However, when there is a final summary judgment, we may consider all grounds the court rules on and those upon which it did not rule, in the interest of judicial economy. *Id.* Based on this, Baker Hughes suggests we should review the denial of its motion.

We decline to extend the reasoning in *Cincinnati Life* to this case because we are not dealing with motions presented to the trial court at the same time. Rather, many months elapsed between the denial of the June 1994 motion and the granting of the 1995 motion.

We overrule Baker Hughes' cross-point.

**The Final Judgment**

In points of error one and two, Keco contends the trial court erred "procedurally and substantively" in rendering its final judgment because it abused its discretion in striking Keco's amended pleadings and because it could not dispose of the entire case based on a motion for partial summary judgment. Given our disposition of points of error three, four, and five, and the remand to the trial court where the pleadings may be amended, these issues are moot, and we decline to address points of error one and two.

We reverse the judgment and remand the cause to the trial court.